IN THE UNITED STATES DISTRICT
COURT FOR THE NORTHERN DISTRICT
OF ILLINOIS EASTERN DIVISION

| | | |
|---|---|---|
| DAVID MEYER | ) | |
|     Plaintiff | ) | |
| | ) | 13-cv-03303 |
| vs. | ) | |
| | ) | Magistrate Judge M. Rowland |
| KRISTA WARD *et alia* | ) | |
|     Defendants. | ) | |

**DEFENDANTS' POST-TRIAL BRIEF**

**INTRODUCTION**

Pursuant to this court's order on Defendants' motion for summary judgment
the remaining counts of the Amended Complaint to be tried were Counts I, III,
VII, and VIII. Counts I and III alleged defendants' sale of unregistered securities.
Count IV alleged a violation of the Illinois Securities Act through Defendants'
misrepresentations regarding past performance and "assets under advisement"
and Defendant Ward's omission in failing to disclose her 2002 personal
bankruptcy. Count VIII alleged Defendants' unjust enrichment through
Defendant's alleged violations of the Illinois Securities Act. As Counts I and III
relate to unregistered securities and Counts IV and VIII relate to
misrepresentation and omissions, Defendants will address Counts I and III
together and Counts IV and VIII together.

**I.    THE SHARES IN THE CALHOUN NEUTRAL MARKET FUND
WERE EXEMPT FROM REGISTRATION
(Counts I and III)**

Rule 506(b) of Regulation D of the Securities Act of 1933 exempts from

United States Securities Registration laws any securities that are offered to less than 35 private, accredited investors. (See attached Exhibit 1) Rule 506(c) of Regulation D of the Securities Act of 1933 exempts from United States Securities Registration laws any securities that are only offered to accredited investors.

The Calhoun Market Neutral Fund ("CMF") was formed by Defendants' attorneys and was exempt from registration under the United States Securities laws. (Trial Transcript Page 80 lines 12 – Page 81 line 8)) The shares bought by plaintiff were only sold to seven other persons. All were accredited investors. (Trial Tr. 125:5-15) Plaintiff presented no evidence to the contrary. As such, Defendants have shown that Plaintiff's shares were exempt from registration and therefore, Plaintiff's claims under Counts I and III must be denied.

## II.     PLAINTIFF WAS NOT MISLEAD BY DEFENDANTS
### (Counts VI and VIII)

In ruling on Defendants' motion for summary judgment on the Illinois Securities Act violation this court stated, "In order to succeed on an ISL claim, a plaintiff must show at a minimum that the defendants "(1) made a misstatement or omission, (2) of material fact, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied." *Elipas v. Jedynak*, No. 07 C 3026, 2010 WL 1286795, at *6 (N.D. Ill. Mar. 26, 2010) (citing *Tirapelli v. Advanced Equities, Inc.*, 351 Ill. App. 3d 450, 455 (2004))." Plaintiff has not proven (1) that Defendants made any misstatement regarding assets under advisement or their track record, (2) that the omission of Ms. Ward's bankruptcy was material, or (3) that plaintiff relied upon relied upon any of these statements or the omission.

Therefore, this court must deny Counts IV and VIII.

    A.     DEFENDANTS DID NOT MISSTATE THEIR EXPERIENCE

    i.   <u>Plaintiff Was Not Deceived by the Term "Assets Under Advisement"</u>

Initially, it is important to note that Plaintiff offered no evidence that the statements regarding Defendants "assets under advisement" were false. At trial, the allegations regarding Defendants "assets under advisement" shifted from those made in the Second Amended Complaint.

Plaintiff testified that he understood there is a difference between "Assets Under Advisement" and "Assets Under Management." He testified that "Assets Under Advisement" are normally greater than "Assets Under Management;" clearly showing he knew the terms to be different. (Trial Tr. 58:11-12)

Yet he chose to "interpret" the two terms to mean the same thing. (Trial Tr. 16:14-19) Plaintiff also testified that he could not determine what Defendants meant by "Assets Under Advisement" but that he was focused on the track record. 16:14-19) In fact, he testified under cross examination that he "was more focused on the track record rather than whether it was under advisement or whether it was under management." (Trial Tr. 54: 14-16)

The evidence makes it clear that the "Assets Under Advisement" vs. "Assets Under Management" issue was not relevant to Plaintiff's decision to invest in the CMF. He testified over and over that it was Defendants' "track record" that he relied upon. (Trial Tr. 17: 1-10; 19: 1-2; 21: 6-15; 22: 1-6; 22:20-25; 47: 5-15)

He never asked if the terms had different meanings. (Trial Tr. 55:11-16) He testified that he was not hung up on whether under advisement or management. The track record was the track record." (Trial Tr. 55:8-10)

Therefore, for all these reasons, any statements by Defendants regarding their "assets under advisement" cannot be a basis of liability to Plaintiff.

ii.     Defendants' Track Record was Unambiguous

Plaintiff testified that he relied on the track record reflected in Plaintiff's Exhibit 9 (Trial Tr. 20:13-24) This document bore the legend that

> "Returns and statistics prior to 2006 are unaudited & from one significant managed account before Calhoun was formed. The portfolio has remained consistent throughout the eight year period and managed by the same investment advisor. Past performance may not be indicative of future results. This summary is not to be construed as any form of solicitation."

Plaintiff testified that he read the legend. (Trial Tr. 20:23- 21:24)

Yet, although he read that the returns prior to 2006 were from one account and unaudited, Plaintiff testified that he was "more focused" on the other document, the DDQ. (See Plaintiff's Ex. 4) Further, he testified that he "assumed" that the CMF track record went back to 1999 even though he had read on Exhibit 9 that the CMF was formed in 2006 (Trial Tr. 20:3-5)

The DDQ also clearly states that "all returns and statistics prior to 2006 are unaudited and from one significant managed account before Calhoun was

4

formed. The portfolio has remained consistent throughout the eight-year period and managed by the same investment advisor." (Trial Tr. 108:5-9) Ms. Ward testified without contradiction that the DDQ stated, "We are consultants domestically and offshore offering our expertise in adding hedge funds to client's portfolio. We offer two hedge fund to funds that are insurance dedicated. … We offer two regular hedge funds. The first is a domestic one and the second is an offshore. Consulting services commenced December '97. The insurance-dedicated accounts start in '99. Those accounts were converted into formal funds October 2004. And the domestic fund to fund for Orizon was formed in July 2006. … All the KPMG audits were available." (Trial Tr. 108:10 – 109:1) It was also clear that the information relating to the period from 1999 through 2005 pertained to Ms. Ward's other business venture, primarily for her work with the Fidelity group. (Trial Tr. 132:24 – 134:2) (See also Plaintiff's Ex. 9)

The DDQ clearly states that its information is a combination of 4 separate funds, including the CMF. If in fact, Plaintiff had read the DDQ he would have known that it referred to four different funds and that the CMF had only been formed in 2006.

As stated above, Plaintiff testified that "the track record was the track record." There are only two documents which Plaintiff claims contained the track record which was so important to him: Exhibit 9 and the DDQ.

Exhibit 9 is a one page document devoted almost entirely to past performance. The legend on Exhibit 9 makes it clear that this is the performance

5

of "one significant managed account before Calhoun was formed."

The DDQ has a small box on page 5 of 17, which shows an annual value of assets under management. It is clear from the DDQ that these assets relate to four funds, one of which was CMF formed in 2006. These two documents could not provide the impression that CMF was an experienced fund with an impressive track record to an experienced investment professional such as Plaintiff; who is a registered investment advisory representative, and who holds FINRA Series 7, Series 63, Series 65 and 66 licenses. (Trial Tr. 4:1-10)

When examined in its entirety, Plaintiff's testimony does not support his claims. Instead the evidence shows Plaintiff to be an opportunist who learned of Defendants' SEC proceedings and initiated litigation in bad faith.

B.     MS. WARD'S PERSONAL BANKRUPTCY WAS NOT MATERIAL

Plaintiff testified that he did not consider Ms. Ward's personal finances at the time he invested in the CMF. (Trial Tr. 70:13-15) The bankruptcy was for personal reasons and were unrelated to Ms. Ward's business ventures. (Trial Tr. 126:7-9)

Plaintiff testified that he presumed a personal bankruptcy needed to be disclosed on a Form U-4 and a DDQ. (Trial Tr. 15: 3-6) However, he presented no evidence that it must be disclosed on these forms nor has he presented a single rule or regulation that requires such a disclosure. (74:1 – 75:6) What is clear is that none of the forms he says he relied upon requested such a disclosure.

As Plaintiff testified that the personal finances of Ms. Ward were not a

6

consideration when he made the investment in CMF and as Plaintiff has presented no evidence that Ms. Ward had a duty to disclose her personal bankruptcy; any omission committed by Ms. Ward cannot be a basis of liability to Plaintiff.

C.    PLAINTIFF DID NOT RELY UPON DEFENDANTS' STATEMENTS

Plaintiff stated that he had "received, reviewed and understood the Offering Memorandum dated August 1, 2006 when he signed it on February 27, 2007. (See Defendants' Exhibit 4H) The Offering Memorandum is the legal document which lays out the risks and disclosures of the offering informing an investor everything he needs to know about the investment.  (Trial Tr. 122:14-18; 123:18-21) As a professional investment advisor he knows that the Offering Memorandum discloses all pertinent information about a fund offering. Yet, Plaintiff ignored that Offering Memorandum in his testimony and even though it was in his exhibit binder, he did not enter it into evidence.

Instead Plaintiff concocts an ever-shifting narrative that he was somehow defrauded. Plaintiff never stated anything unequivocally. Instead Plaintiff repeatedly testified that he "assumed" (Trial Tr. 7:4-5; 8:15-17; 8:22-25; 16:22-25; 20:3-9; 54:4-7; 55:1-2; 67:23-68:1; 68:21-25; 69:15-17; 70:12-25; 71:11-15; 76:11-15) or he "interpreted" " (Trial Tr. 16:14-19; 18:3-13; 54:4-12; 57:1-5; 57:25 – 58:1' 58:13-15; 75:20-22) or he "inferred " (Trial Tr. 17:6-10; 18:9-13; 18:18-20; 22:7-9) or he "presumed" " (Trial Tr. 15:9-6; 47:16 – 48:3; 76:11-15)

The evidence does show that Plaintiff learned of the CMF through his

employer Orizon which substituted the CMF for its under achieving Diligent Asset Diversification fund ("DAD.") (Trial Tr. 44:24 – 45:12; 47-16 – 48:3). Orizon recommended CMF to Plaintiff and its other clients. (Trial Tr. 5: 3-8) Plaintiff relied upon Orizon to have conducted the "appropriate due diligence" (Trial Tr. 47:18 – 48:1) Plaintiff liquified his interest in DAD and invested all of it into CMF. (Trial Tr. 45:21 – 46:6)

The evidence, both direct and circumstantial, shows that Plaintiff put no more thought into that transaction other than that Orizon was suggesting all DAD investors to do so and therefore did not rely upon any of Defendants' actions or statements.

## CONCLUSION

The evidence also shows that Plaintiff had no reason to bring an action against Defendants until he learned about their SEC proceedings. Plaintiff was exceedingly evasive when questioned by this court as to how he found out about the SEC action. (Trial Tr. 60:22 – 61:17)

Plaintiff's evasiveness regarding the SEC, his prevaricating use of terms such as "assume," "infer," etc., his varying assertions regarding "Assets Under Advisement" and "Assets Under Management" from (1) being totally mislead by the confusion to (2) "assuming" that they were synonymous to (3) knowing the difference between the two to (4) focusing on the track record; all show the shifting sands of a duplicitous mind.

For the foregoing reasons, Plaintiff's claims should be dismissed entirely.

Respectfully submitted,

/s/ John J. Muldoon, III
Attorney for Defendants

John J. Muldoon, III
Muldoon & Muldoon, LLC
Illinois Attorney No. 6185878
30 N. LaSalle Street, Suite 2950
Chicago, IL 60602
312-739-3550

CERTIFICATE OF SERVICE

I, John J. Muldoon, III, certify that on this date, I caused the foregoing to be

electronically filed with the Court. Electronic notice of this filing will be sent to all

counsel of record.

Dated June 23, 2017

/s/ John J. Muldoon, III

1

Case: 1:13-cv-03303 Document #: 137 Filed: 06/23/17 Page 11 of 14 PageID #:994

ELECTRONIC CODE OF FEDERAL REGULATIONS

e-CFR data is current as of April 14, 2017

Title 17 → Chapter II → Part 230 → §230.506

Title 17: Commodity and Securities Exchanges
PART 230—GENERAL RULES AND REGULATIONS, SECURITIES ACT OF 1933

**§230.506   Exemption for limited offers and sales without regard to dollar amount of offering.**

(a) *Exemption.* Offers and sales of securities by an issuer that satisfy the conditions in paragraph (b) or (c) of this section shall be deemed to be transactions not involving any public offering within the meaning of section 4(a)(2) of the Act.

(b) *Conditions to be met in offerings subject to limitation on manner of offering*—(1) *General conditions.* To qualify for an exemption under this section, offers and sales must satisfy all the terms and conditions of §§230.501 and 230.502.

(2) *Specific conditions*—(i) *Limitation on number of purchasers.* There are no more than or the issuer reasonably believes that there are no more than 35 purchasers of securities from the issuer in any offering under this section.

NOTE TO PARAGRAPH (b)(2)(i): See §230.501(e) for the calculation of the number of purchasers and §230.502(a) for what may or may not constitute an offering under paragraph (b) of this section.

(ii) *Nature of purchasers.* Each purchaser who is not an accredited investor either alone or with his purchaser representative(s) has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment, or the issuer reasonably believes immediately prior to making any sale that such purchaser comes within this description.

(c) *Conditions to be met in offerings not subject to limitation on manner of offering*—(1) *General conditions.* To qualify for exemption under this section, sales must satisfy all the terms and conditions of §§230.501 and 230.502(a) and (d).

(2) *Specific conditions*—(i) *Nature of purchasers.* All purchasers of securities sold in any offering under paragraph (c) of this section are accredited investors.

(ii) *Verification of accredited investor status.* The issuer shall take reasonable steps to verify that purchasers of securities sold in any offering under paragraph (c) of this section are accredited investors. The issuer shall be deemed to take reasonable steps to verify if the issuer uses, at its option, one of the following non-exclusive and non-mandatory methods of verifying that a natural person who purchases securities in such offering is an accredited investor; provided, however, that the issuer does not have knowledge that such person is not an accredited investor:

(A) In regard to whether the purchaser is an accredited investor on the basis of income, reviewing any Internal Revenue Service form that reports the purchaser's income for the two most recent years (including, but not limited to, Form W-2, Form 1099, Schedule K-1 to Form 1065, and Form 1040) and obtaining a written representation from the purchaser that he or she has a reasonable expectation of reaching the income level necessary to qualify as an accredited investor during the current year;

(B) In regard to whether the purchaser is an accredited investor on the basis of net worth, reviewing one or more of the following types of documentation dated within the prior three months and obtaining a written representation from the purchaser that all liabilities necessary to make a determination of net worth have been disclosed:

(*1*) With respect to assets: Bank statements, brokerage statements and other statements of securities holdings, certificates of deposit, tax assessments, and appraisal reports issued by independent third parties; and

(*2*) With respect to liabilities: A consumer report from at least one of the nationwide consumer reporting agencies; or

(C) Obtaining a written confirmation from one of the following persons or entities that such person or entity has taken reasonable steps to verify that the purchaser is an accredited investor within the prior three months and has determined that such purchaser is an accredited investor:

(*1*) A registered broker-dealer;

(*2*) An investment adviser registered with the Securities and Exchange Commission;

EXHIBIT 1

Case: 1:13-cv-03303 Document #: 137 Filed: 06/23/17 Page 12 of 14 PageID #:995

(*3*) A licensed attorney who is in good standing under the laws of the jurisdictions in which he or she is admitted to practice law; or

(*4*) A certified public accountant who is duly registered and in good standing under the laws of the place of his or her residence or principal office.

(D) In regard to any person who purchased securities in an issuer's Rule 506(b) offering as an accredited investor prior to September 23, 2013 and continues to hold such securities, for the same issuer's Rule 506(c) offering, obtaining a certification by such person at the time of sale that he or she qualifies as an accredited investor.

*Instructions to paragraph (c)(2)(ii)(A) through (D) of this section:*

1. The issuer is not required to use any of these methods in verifying the accredited investor status of natural persons who are purchasers. These methods are examples of the types of non-exclusive and non-mandatory methods that satisfy the verification requirement in §230.506(c)(2)(ii).

2. In the case of a person who qualifies as an accredited investor based on joint income with that person's spouse, the issuer would be deemed to satisfy the verification requirement in §230.506(c)(2)(ii)(A) by reviewing copies of Internal Revenue Service forms that report income for the two most recent years in regard to, and obtaining written representations from, both the person and the spouse.

3. In the case of a person who qualifies as an accredited investor based on joint net worth with that person's spouse, the issuer would be deemed to satisfy the verification requirement in §230.506(c)(2)(ii)(B) by reviewing such documentation in regard to, and obtaining written representations from, both the person and the spouse.

(d) "*Bad Actor*" *disqualification.* (1) No exemption under this section shall be available for a sale of securities if the issuer; any predecessor of the issuer; any affiliated issuer; any director, executive officer, other officer participating in the offering, general partner or managing member of the issuer; any beneficial owner of 20% or more of the issuer's outstanding voting equity securities, calculated on the basis of voting power; any promoter connected with the issuer in any capacity at the time of such sale; any investment manager of an issuer that is a pooled investment fund; any person that has been or will be paid (directly or indirectly) remuneration for solicitation of purchasers in connection with such sale of securities; any general partner or managing member of any such investment manager or solicitor; or any director, executive officer or other officer participating in the offering of any such investment manager or solicitor or general partner or managing member of such investment manager or solicitor:

(i) Has been convicted, within ten years before such sale (or five years, in the case of issuers, their predecessors and affiliated issuers), of any felony or misdemeanor:

(A) In connection with the purchase or sale of any security;

(B) Involving the making of any false filing with the Commission; or

(C) Arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities;

(ii) Is subject to any order, judgment or decree of any court of competent jurisdiction, entered within five years before such sale, that, at the time of such sale, restrains or enjoins such person from engaging or continuing to engage in any conduct or practice:

(A) In connection with the purchase or sale of any security;

(B) Involving the making of any false filing with the Commission; or

(C) Arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities;

(iii) Is subject to a final order of a state securities commission (or an agency or officer of a state performing like functions); a state authority that supervises or examines banks, savings associations, or credit unions; a state insurance commission (or an agency or officer of a state performing like functions); an appropriate federal banking agency; the U.S. Commodity Futures Trading Commission; or the National Credit Union Administration that:

(A) At the time of such sale, bars the person from:

(*1*) Association with an entity regulated by such commission, authority, agency, or officer;

(*2*) Engaging in the business of securities, insurance or banking; or

(*3*) Engaging in savings association or credit union activities; or

(B) Constitutes a final order based on a violation of any law or regulation that prohibits fraudulent, manipulative, or deceptive conduct entered within ten years before such sale;

(iv) Is subject to an order of the Commission entered pursuant to section 15(b) or 15B(c) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(b) or 78o-4(c)) or section 203(e) or (f) of the Investment Advisers Act of 1940 (15 U.S.C. 80b-3 (e) or (f)) that, at the time of such sale:

(A) Suspends or revokes such person's registration as a broker, dealer, municipal securities dealer or investment adviser;

(B) Places limitations on the activities, functions or operations of such person; or

(C) Bars such person from being associated with any entity or from participating in the offering of any penny stock;

(v) Is subject to any order of the Commission entered within five years before such sale that, at the time of such sale, orders the person to cease and desist from committing or causing a violation or future violation of:

(A) Any scienter-based anti-fraud provision of the federal securities laws, including without limitation section 17(a)(1) of the Securities Act of 1933 (15 U.S.C. 77q(a)(1)), section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. 78j(b)) and 17 CFR 240.10b-5, section 15(c)(1) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(c)(1)) and section 206(1) of the Investment Advisers Act of 1940 (15 U.S.C. 80b-6(1)), or any other rule or regulation thereunder; or

(B) Section 5 of the Securities Act of 1933 (15 U.S.C. 77e).

(vi) Is suspended or expelled from membership in, or suspended or barred from association with a member of, a registered national securities exchange or a registered national or affiliated securities association for any act or omission to act constituting conduct inconsistent with just and equitable principles of trade;

(vii) Has filed (as a registrant or issuer), or was or was named as an underwriter in, any registration statement or Regulation A offering statement filed with the Commission that, within five years before such sale, was the subject of a refusal order, stop order, or order suspending the Regulation A exemption, or is, at the time of such sale, the subject of an investigation or proceeding to determine whether a stop order or suspension order should be issued; or

(viii) Is subject to a United States Postal Service false representation order entered within five years before such sale, or is, at the time of such sale, subject to a temporary restraining order or preliminary injunction with respect to conduct alleged by the United States Postal Service to constitute a scheme or device for obtaining money or property through the mail by means of false representations.

(2) Paragraph (d)(1) of this section shall not apply:

(i) With respect to any conviction, order, judgment, decree, suspension, expulsion or bar that occurred or was issued before September 23, 2013;

(ii) Upon a showing of good cause and without prejudice to any other action by the Commission, if the Commission determines that it is not necessary under the circumstances that an exemption be denied;

(iii) If, before the relevant sale, the court or regulatory authority that entered the relevant order, judgment or decree advises in writing (whether contained in the relevant judgment, order or decree or separately to the Commission or its staff) that disqualification under paragraph (d)(1) of this section should not arise as a consequence of such order, judgment or decree; or

(iv) If the issuer establishes that it did not know and, in the exercise of reasonable care, could not have known that a disqualification existed under paragraph (d)(1) of this section.

*Instruction to paragraph (d)(2)(iv).* An issuer will not be able to establish that it has exercised reasonable care unless it has made, in light of the circumstances, factual inquiry into whether any disqualifications exist. The nature and scope of the factual inquiry will vary based on the facts and circumstances concerning, among other things, the issuer and the other offering participants.

(3) For purposes of paragraph (d)(1) of this section, events relating to any affiliated issuer that occurred before the affiliation arose will be not considered disqualifying if the affiliated entity is not:

(i) In control of the issuer; or

(ii) Under common control with the issuer by a third party that was in control of the affiliated entity at the time of such events.

(e) *Disclosure of prior "bad actor" events.* The issuer shall furnish to each purchaser, a reasonable time prior to sale, a description in writing of any matters that would have triggered disqualification under paragraph (d)(1) of this section but occurred before September 23, 2013. The failure to furnish such information timely shall not prevent an issuer from relying on this section if the issuer establishes that it did not know and, in the exercise of reasonable care, could not have known of the existence of the undisclosed matter or matters.

*Instruction to paragraph (e).* An issuer will not be able to establish that it has exercised reasonable care unless it has made, in light of the circumstances, factual inquiry into whether any disqualifications exist. The nature and scope of the factual inquiry will vary based on the facts and circumstances concerning, among other things, the issuer and the other offering participants.

[47 FR 11262, Mar. 6, 1982, as amended at 54 FR 11373, Mar. 20, 1989; 78 FR 44770, 44804, July 24, 2013]

---

Need assistance?