# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DAVID MEYER,

      Plaintiff,

v.

KRISTA WARD and CALHOUN
ASSET MANAGEMENT LLC,

      Defendants.

No. 13 C 3303

Magistrate Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

In 2007, Plaintiff David Meyer ("Plaintiff" or "Meyer") invested in the Calhoun Market Neutral Fund. Krista Ward ("Ward") was the owner of Calhoun Asset Management LLC ("Calhoun"), which was the investment adviser to the Calhoun Market Neutral Fund. Plaintiff brought this lawsuit against Defendants Calhoun and Ward alleging among other things that they violated federal and Illinois securities laws. At a one-day bench trial, the remaining claims were Counts I (Violation of Section 12 of the Securities Act of 1933), III (Violation of the Illinois Securities Law of 1953), VII (Rescission), and VIII (Unjust Enrichment). After considering the testimony, exhibits admitted at trial, and the parties' pre-trial and post-trial submissions, the Court concludes that Plaintiff failed to prove that he is entitled to any recovery from Defendants. The Court enters findings of fact and

conclusions of law pursuant to Fed. R. Civ. P. 52(a)[1] and enters judgment in favor of Defendants.

## I. JURISDICTION AND APPLICABLE LAW

The parties consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c). (Dkt. 75). This Court has jurisdiction pursuant to the Securities Exchange Act of 1934, 15 U.S.C. § 78aa; 28 U.S.C. § 1331. This Court has supplemental jurisdiction over Meyer's state and common law claims pursuant to 28 U.S.C. § 1367.

## II. PRIOR PROCEEDINGS

On February 14, 2014, Meyer filed an eight-count amended complaint. (Dkt. 24) ("Amended Complaint"). On June 18, 2014, the Court dismissed Meyer's claims of breach of fiduciary duty and breach of contract. (Dkt. 38). On September 27, 2016, this Court granted in part and denied in part Defendants' motion for summary judgment (Dkt. 110), leaving for trial Plaintiff's claims in Counts I, III, VII, and VIII. The case against Ward was stayed as she was in a bankruptcy proceeding. (*see* Dkts. 114, 118). However, on April 5, 2017, Ward's bankruptcy case closed. (Bankr. N.D. Ill. Case No. 16-33669, Dkt. 24). Therefore, the stay in this case against Ward ended April 5, 2017. *See DeliverMed Holdings, LLC v. Schaltenbrand*, 734 F.3d 616, 621 n.1 (7th Cir. 2013) ("[T]he automatic stay of actions against the debtor ends at the close of its bankruptcy case.") (citing 11 U.S.C. § 362(c)(2)(A)).

---

[1] To the extent that any Findings of Fact may be deemed Conclusions of Law, they shall also be considered Conclusions of Law. To the extent that any Conclusions of Law may be deemed findings of fact, they shall also be considered Findings of Fact.

## III. THE TRIAL

The main issues for trial were whether: (1) Defendants violated federal law by selling unregistered securities or, as Defendants argue, sale of the Calhoun Market Neutral Fund was exempt from registration; (2) Plaintiff relied on material misrepresentations and/or omissions made by Defendants in violation of the Illinois Securities Law; and (3) Defendants were unjustly enriched as a result of Plaintiff's investment. Before trial, the parties submitted a joint proposed pretrial order and joint proposed findings of fact as well as separate proposed findings of fact and conclusions of law. (Dkts. 125, 127). The Court held a pre-trial conference on April 19, 2017. During trial, defense counsel moved orally to exclude the December 29, 2011 and July 9, 2012 Orders of the U.S. Securities and Exchange Commission (SEC) involving Calhoun and Ward, and maintained a standing objection to any reference to the SEC action.[2] In a written opinion after trial, this Court ruled that the 2012 Order Making Findings and Imposing Remedial Sanctions and a Cease-and-Desist Order ("SEC Consent Decree") was not admissible. (Dkt. 133). However the 2011 Order Instituting Administrative and Cease-and-Desist Proceedings against Calhoun and Ward ("SEC OIP" (PX 11)) was admissible. (*Id.*). After trial, the parties filed simultaneous post-trial briefs. Only Defendants filed a response brief. (Dkts. 136–38).

---

[2] When the Court raised the issue of the parties' dispute over the admissibility of the SEC findings during the pre-trial conference, Plaintiff's counsel represented that testimony about the SEC action may not be needed. The Court therefore deferred any ruling. At the end of trial, because the SEC action was an issue at trial, the Court decided that it would issue a written opinion on the issue before the parties submitted their post-trial briefs.

# IV. FINDINGS OF FACT

## A. The Parties

Defendant Calhoun was an Illinois limited liability company and SEC-registered investment adviser that was the investment adviser to several offshore funds including the Calhoun Market Neutral Fund ("Calhoun Fund"), a Cayman Islands company. (Stip.[3] at ¶¶ 1–2). Defendant Ward was the sole member, owner, and only full time employee of Calhoun. (*Id*. at ¶ 3).[4] Plaintiff Meyer was an investment advisory representative employed by Orizon Investment Counsel ("Orizon"), a registered investment adviser. (*Id*. at ¶ 7, Tr. at 41, 67, PX 11 at 3).

Meyer was a sophisticated investor: he was an investment advisory representative with a FINRA (Financial Industry Regulatory Authority) license and had been in the financial services industry for more than 30 years (20 years at the time of the events in this case). (Tr. at 4, 41). As part of his job, he was consistently presented with investment opportunities and "could do nothing but just look at investment opportunities as an advisor if I wanted." He took pride in making his individual investment decisions "based on due diligence." (*Id*. at 59).

## B. The Calhoun Fund

In late 2006, Meyer's employer, Orizon, recommended that he and other Orizon accredited investors consider investing in the Calhoun Fund. (Tr. at 5, 43–

---

[3] The parties' Pretrial Order Stipulations are referred to herein as "Stip." (Dkt. 125). These Stipulations are the same as the parties' joint proposed findings of fact. (Dkt. 127).

[4] Taipan Wealth Advisors LLC was a predecessor company to Calhoun. (Tr. at 7, 52). Both Taipan and Calhoun were registered investment advisers. (PX 11 at 2).

45). Orizon had initiated a relationship with Ward around the time it decided to replace the Diligent Asset Diversification Fund ("DAD"), the fund of funds[5] that Orizon had been offering investors. (*Id.* at 5, 44–45).[6] Orizon asked Ward for information about the Calhoun Fund. (*Id.* at 87–88). The Calhoun Fund was offered only to Orizon's accredited investors. (*Id.* at 45, 52, 87, 124). It was not offered to the public. (*Id.* at 125). Meyer and other investors initially learned about the investment opportunity from Orizon, not Defendants. (*Id.* at 5, 44–46, 88). The Calhoun Fund had only eight investors including Meyer; all eight were accredited investors. (*Id.* at 87, 124–125).

Each investor signed a Subscription Agreement in which the investor agreed that interests in the fund would be held only by "Eligible Investors" and that they had read and understood pertinent investment documents and had the financial background to assess the risk of investing in the Calhoun Fund. (Tr. at 124–25; DX 4H). Specifically the Subscriber (a) acknowledged receipt and familiarity with the Offering Memorandum and the Subscription Agreement and (b) warranted that he "possesse[d] requisite knowledge and experience in financial matters such that [he] is capable of evaluating the merits and risks of an investment in the Fund

---

[5] A "fund of funds" exists when "one investment company (an 'acquiring fund') invests some or all its assets in one or more other investment companies (an 'underlying fund')." Jay S. Neuman, "Fund of Funds", ALI-ABA Course of Study Materials, Course No. SH091, June 2003. *See also Curry v. TD Ameritrade, Inc.*, No. 1:14-CV-1361-LMM, 2015 WL 11251449, at *2 (N.D. Ga. June 30, 2015) (fund-of-funds is "a portfolio of other investment funds rather than direct investments in stocks, bonds, or other securities.").

[6] Plaintiff's counsel objected to the relevance of testimony about the DAD fund, but the testimony was relevant to help explain how the Orizon-Calhoun relationship began and why, in part, Meyer invested in the Calhoun Fund.

(including without limitation, the ability to suffer a complete loss of the investment. . .). (DX 4H).

## C. Meyer's Decision to Invest in the Calhoun Fund

Before investing, Meyer believed due diligence had been performed on both Ward and the Calhoun Fund by Orizon. (Tr. at 47–48, 67–68). Before "it could get to Orizon to talk to its investors, [broker-dealer] Qa3 would have had to [have] been supportive" and the Calhoun Fund would have undergone Qa3's review protocols. (*Id*. at 67–69). When he made the decision to invest his own money, Meyer relied on the due diligence he assumed was performed by Orizon on both Ward and the Calhoun Fund and the review protocols that he knew Qa3 would have required prior to approving the investment. (*Id*. at 47–48, 67–70). In addition, DAD was being dissolved which resulted in a payout to Meyer. (*Id*. at 45–46). Replacing his investment in DAD was a "contributing factor" in Meyer's decision to invest in the Calhoun Fund. (*Id*. at 45–46, 48).

In addition to company-level due diligence, Meyer testified that after receiving Orizon's recommendation, he did his own due diligence and then made his decision individually to invest. (*Id*. at 5, 23–25, 46, 59). In late 2006 and early 2007, Meyer had phone conversations with Ward. (*Id*. at 5, 24–25).[7] He also reviewed three documents: (1) the Taipan Wealth Advisors, LLC Alternative Investment Management Association (AIMA) Due Diligence Questionnaire (PX4) ("DDQ"); (2) Taipan Wealth Advisors marketing overview (PX 6) ("Taipan Marketing Overview");

[7] Although the parties stipulated that Meyer had no "personal contact" with Ward before he invested (Stip. ¶ 8), Meyer testified at trial that he had phone conversations with Ward before investing.

and (3) the Calhoun Fund one-page marketing document ("Calhoun Fund Marketing Document") (PX 9). (Tr. at 25–26). These documents were also shared with the other Calhoun Fund investors. (*Id*. at 47).

On February 22, 2007, Meyer signed a Calhoun Fund Subscription Agreement ("Subscription Agreement") (DX 4H) to invest in the Calhoun Fund, an offshore fund, through his personal Individual Retirement Account. (Stip. at ¶¶ 2, 4–7; Tr. at 6, 41, 80). The Calhoun Fund was described as a Cayman Island exempt company created for international investors and U.S. tax-exempt investors. (PX 9).[8] Meyer invested $209,825.06 in the Calhoun Fund and later received back $144,324.43. (Stip. at ¶¶ 6, 10; Tr. at 31). The parties stipulated that the S&P 500 index lost approximately 40% from the high point in 2008 to the low point in 2009. (Stip. at ¶11).

### D. Credibility

Only two witnesses testified at trial. The Court weighed their credibility as follows: the Court found Ward to be credible. Her demeanor was confident, her answers direct, and her testimony consistent. By contrast, Meyer's testimony, particularly when it addressed his claims about Defendants' alleged misrepresentations and omissions, was internally inconsistent or contradictory. His answers were often vague and equivocating, and his testimony was peppered with

---

[8] There was also a fund, "Orizon Diversified Series", which was a domestic fund, described as a Delaware limited partnership created for U.S. investors and registered investment advisors and broker dealers to white label. (DX 3). Orizon had a selling agreement with Calhoun to offer that fund to Orizon's clients. (DX 3; PX 11 ¶ 11; Tr. at 109).

statements about what he "assumed" and "inferred." In addition, he frequently used the present tense, making it sometimes difficult to tell whether he was testifying to what he knew before investing or what he later learned.

## V. CONCLUSIONS OF LAW

### A. Section 12 of the Securities Act

Plaintiff claims that Defendants sold unregistered securities in violation Section 12(a)(1) of the Securities Act of 1933. Defendants counter that the Calhoun Fund was exempt from registration because it was a private offering. Under Section 5(a) of the Securities Act, it is unlawful to sell unregistered securities in interstate commerce. 15 USCS § 77e. Section 12(a)(1) provides a remedy to a person purchasing a security that violates § 77e. 15 U.S.C.S. § 77*l*(a)(1). However, transactions "not involving any public offering" are exempt from registration. 15 USCS § 77d(a)(2); 17 CFR §230.506 ("Regulation D").

Defendants established by a preponderance of the evidence that the Calhoun Fund was exempt from registration as a private placement. *See SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (burden of proof on party claiming private offering exemption); *Springfield Oil Drilling Corp. v. Weiss*, No. 02 C 249, 2003 U.S. Dist. LEXIS 14936, at *28 (N.D. Ill. Aug. 26, 2003) (preponderance of the evidence standard applied to private offering exemption). Preponderance of the evidence means that "trier of fact must believe that it is more likely than not that the evidence establishes the proposition in question." *Am. Grain Trimmers, Inc. v. Office of Workers' Comp. Programs*, 181 F.3d 810, 817 (7th Cir. 1999).

Courts have identified four factors to guide the determination of whether an offering is exempt as a private placement: "(1) the number of offerees and their relationship to the issuer; (2) the number of units offered; (3) the size of the offering; and (4) the manner of the offering." *ABN AMRO, Inc. v. Capital Int'l, Ltd.*, 595 F. Supp. 2d 805, 833 (N.D. Ill. 2008); *see also Cogniplex, Inc. v. Hubbard Ross, L.L.C.*, 00 C 7463, 00 C 7933, 2001 U.S. Dist. LEXIS 11113, at *33 (N.D. Ill. Apr. 26, 2001) ("[Defendant] may well be able to show that Arns and Hubbard were sophisticated investors who did not need the protections of the securities laws, by pointing to specific facts relevant to Arns and Ross' investment experience, the nature of the relationship between Hubbard, Arns and Ross, and how Hubbard extended the offer to Arns and Ross.").[9]  The purpose of the exemption statute is to "protect investors by promoting full disclosure of information thought necessary to informed investment decisions." *Ralston Purina Co.*, 346 U.S. at 124. Therefore the focus of the inquiry is "on the need of the offerees for the protections afforded by registration." *Id.* at 127.

The Court concludes that Defendants met their burden to show the Calhoun Fund was a private offering. The evidence at trial showed that: (1) the Calhoun Fund was offered only to Orizon's accredited investors[10] and was not offered to the

---

[9] *See Johnston v. Bumba,* 764 F. Supp. 1263, 1273 (N.D. Ill. 1991) (finding that generally plaintiffs only had to show Regulation D criteria were met with respect to purchasers because certain Regulation D standards applied only to ultimate purchasers, not offerees); *see also* 17 CFR §§230.501, 502, and 506 (using term "purchaser").

[10] As defined in Regulation D, an individual who is an "accredited investor" is a person "whose individual net worth, or joint net worth with that person's spouse, exceeds $ 1,000,000" or has an "individual income in excess of $ 200,000 in each of the two most

public; (2) there were only eight investors, including Meyer, in the fund, and all eight were accredited investors; (3) Orizon initiated the relationship with Defendants and then recommended the Calhoun Fund to Meyer and other Orizon accredited investors; (4) Meyer was a sophisticated investor with access to information about the fund and the opportunity to ask questions of Ward; and (5) each investor in the Calhoun Fund signed a Subscription Agreement representing that he/she had financial knowledge and experience, was capable of evaluating the merits and risks of investing in the Fund and had read pertinent investment documentation including the Subscription Agreement and Offering Memorandum.[11]

With regard to the manner of the offering, Meyer's and Ward's testimony was consistent that Orizon approached Ward, asked for information about her funds, and then recommended the Calhoun Fund to its accredited investors. There was no testimony that Ward initiated these communications or reached out to any other potential investors. There was no evidence of any cold calls, mass mailing, or general solicitation by Defendants. *See* 17 CFR § 230.502(c) (exemption not available if offering is sold by means of general solicitation or general advertising); *Cf. Johnston*, 764 F. Supp. 1263 (finding private offering not proven where evidence

---

recent years or joint income with that person's spouse in excess of $ 300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year." 17 CFR § 230.501(a)(5) and (6).

[11] The evidence showed that the minimum initial subscription in the Calhoun Fund was $250,000. (DX 4H). Although Defendants otherwise offered limited evidence about the number of units or total value of the offering, failure to satisfy all conditions "does not raise the presumption that the offering cannot be exempt," and the "bottom line issue" is whether the investors need the protection of the Securities Act. *Johnston*, 764 F. Supp. at 1273–74.

showed, among other things, that there were 275 investors in four partnerships, mass mailings, and cold calls).

Meyer and the seven other investors were not persons in need of the protections of registration. All eight investors were accredited investors, received the same information Meyer did, and signed a Subscription Agreement for the Calhoun Fund. (Tr. at 45, 47, 87, 124–125). That Subscriber Agreement specifically confirmed that investors received and understood the August 1, 2006 Offering Memorandum for the Calhoun Fund ("Offering Memorandum" or "OM"), and Ward testified credibly that the Offering Memorandum disclosed to investors "all the risks and disclosures of private placement." (Tr. at 122).[12] Other documentation investors reviewed prior to investing also shows they were on notice that the Calhoun Fund was intended to be exempt: that documentation stated that the Calhoun Fund was "exempt" (PX 9); "registered with and regulated by the Cayman Island Monetary Authority" and in response to a question about the legal structure stated it was a

---

[12] The language in the OM, which Meyer and the other investors confirmed having read and understood in their Subscription Agreements, further supports that this was a private offering: "The offering of interests is being made in reliance upon an exemption from registration under the United States Securities Act of 1933, as amended, for a sale of securities which does not involve a public offering. These securities and this offering have not been registered with or approved by the United States Securities and Exchange Commission…". Although the OM was attached to the Amended Complaint (Dkt. 24, Exh. 2), Defendant's Summary Judgment Memorandum (Dkt. 101, Exhs. 1A-1B), and cited in Plaintiff's Proposed Findings of Fact (Dkt. 127 at ¶11), it was not offered as evidence at trial (see Tr. at 123). Meyer's Subscription Agreement was admitted into evidence at trial. The seven other Subscription Agreements and the OM were used at trial without being admitted into evidence. Plaintiff's counsel asked Ward if Meyer received the OM and she confirmed he did. (Tr. at 81). Plaintiff's counsel also did not object to the OM or seven other Subscription Agreements being shown and discussed. This was a bench trial, so there was no risk of jury confusion, and no surprise or prejudice to Meyer—he even referenced and quoted from the OM in his pre-trial Proposed Findings. The Court considers the OM and seven Subscription Agreements not as substantive evidence but as corroborating support for the trial testimony which was consistent with those documents.

"Cayman Island Exempt Fund." (PX 4 at 5, 14). One of Plaintiff's own proposed findings is that the Calhoun Fund is "a Cayman Island *Exempted* Limited Company." (Dkt. 127 at ¶3) (emphasis added).

Courts have found that acquiescence to the sale without registration is convincing evidence that the offering was private. *See Acme Propane, Inc. v. Tenexco, Inc.,* 844 F.2d 1317, 1321 (7th Cir. 1988) ("[P]laintiffs' acquiescence in the sale without registration means that we must assume that they met the requirements of a § 4(2) or Rule 506 sale, the most important for current purposes being that plaintiffs are sophisticated, informed, and probably wealthy investors, 'those who are shown to be able to fend for themselves'") (citing *Ralston Purina Co.,* 346 U.S. at 125); *see also Springfield Oil Drilling Corp.,* 2003 U.S. Dist. LEXIS 14936, at *27 (on summary judgment, private offering exemption proven based on evidence including investor's admission of investment experience and documents in which investor attested that he understood the offering was intended to be private).

Citing 17 CFR §230.503, Plaintiff argues that Defendants were required to file a notice with the SEC when claiming a Regulation D exemption. (Dkt. 136 at 5). However, a Form D filing is not a condition of the exemption. *See Premier Capital Mgmt., LLC v. Cohen*, No. 02 C 5368, 2008 U.S. Dist. LEXIS 23484, at *19 n.6 (N.D. Ill. Mar. 24, 2008); *Little v. Ressler Hardwoods & Flooring, Inc. (In re Ressler Hardwoods & Flooring, Inc.)*, Nos. 1:08-bk-01878MDF, 1:08-ap-00109, 2009 Bankr.

LEXIS 4441, at *27 (Bankr. M.D. Pa. Mar. 31, 2009) ("an issuer's failure to file Form D does not bar reliance on the Rule 506 safe harbor").[13]

In sum, Defendants established that the Calhoun Fund was exempt from registration. Plaintiff did not rebut the evidence and testimony on this issue. This case is not one where the "obvious opportunities for pressure and imposition make it advisable" that the Calhoun Fund be required register as a public offering. *Ralston Purina Co.*, 346 U.S. at 127.[14]

In his post-trial brief, Plaintiff argues that even if the securities are exempt, Defendants are liable under the anti-fraud provisions of Section 12(a). (Dkt. 136 at 5). But Defendants met their burden to show the Calhoun Fund was a private offering, so Section 12(a) does not apply. *Whirlpool Fin. Corp. v. GN Holdings*, 67 F.3d 605, 609 n.2 (7th Cir. 1995) (Section 12(a)(2) does not apply to cases not "concern[ing] a public offering"); *Alpha Mgmt. v. Last Atlantis Capital Mgmt., LLC*, No. 12 C 4642, 2012 U.S. Dist. LEXIS 157223, at *8–10 (N.D. Ill. Nov. 2, 2012) (Section 12(a)(1) and (a)(2) only apply to public offerings); 15 U.S.C. § 77l(a).

---

[13] Moreover, as Defendants point out (Dkt. 138 at 2–3), the SEC OIP does not mention any registration issue with regard to the Calhoun Market Neutral Fund. While not dispositive, this is additional persuasive support for finding that Defendants met their burden to show that the Calhoun Fund was a private offering.

[14] Plaintiff did not raise any issue about the Calhoun Fund's registration under Illinois law. The Pretrial Order states that Plaintiff alleges that shares in the Calhoun Fund were "not properly registered under the United States securities law." (Dkt. 125 at 2). *See DeliverMed Holdings*, 734 F.3d at 628 ("[T]he pretrial order is treated as superseding the pleadings and establishes the issues to be considered at trial.") (internal citations and quotations omitted).

**B. The Illinois Securities Law**

To establish a violation under the Illinois Securities Law of 1953, Meyer must show that Defendants: (1) made a misstatement or omission of material fact, (2) in connection with the purchase or sale of securities, (3) upon which Meyer relied. *See Hollerich v. Robert C. Acri*, No. 14 CV 10411, 2017 U.S. Dist. LEXIS 54633, at *14 (N.D. Ill. Apr. 10, 2017) (citation omitted).[15] Meyer's burden at trial was to prove a violation by a preponderance of the evidence.[16]

Under the securities laws, recovery is permitted only for material misrepresentations, and "in order to be material, a statement must 'significantly alter the total mix of information available to the investor.'" *Adler v. William Blair & Co.*, 271 Ill. App. 3d 117, 130, 207 Ill. Dec. 770, 779, 648 N.E.2d 226, 235 (1st Dist. 1995) (quoting *Acme Propane, Inc.*, 844 F.2d at 1322). There must be a substantial likelihood that the reasonable investor would have viewed the fact as significantly "alter[ing] the 'total mix' of information" available. *See ABN AMRO, Inc.*, 595 F. Supp. 2d at 838 (internal citations and quotations omitted). Unspecific, optimistic statements often are not actionable material representations. *See*

---

[15] Meyer claims that Defendants violated Section 12(G) of the Illinois Securities Law (815 ILCS 5/12(G)). (Dkt. 127 at 3–4).

[16] *See Ramirez v. T&H Lemont, Inc.,* 845 F.3d 772, 777 (7th Cir. 2016) (presumption in federal civil case that burden is proof by a preponderance of the evidence) (internal citations and quotations omitted); *Herman & Maclean v. Huddleston*, 459 U.S. 375 (1983) (preponderance of the evidence standard in federal securities action); *JJR, LLC v. Turner*, 2016 IL App (1st) 143051, ¶ 30, 405 Ill. Dec. 527, 536, 58 N.E.3d 788, 797 (Illinois courts look to the corresponding provisions of the federal Securities Act to interpret the Illinois Securities Law); *see also Hanson-Suminski v. Rohrman Midwest Motors, Inc.*, 386 Ill. App. 3d 585, 593, 325 Ill. Dec. 461, 470, 898 N.E.2d 194, 203 (1st Dist. 2008) ("standard of proof for a statutory fraud claim [under the Illinois Consumer Fraud and Deceptive Business Practices Act] is preponderance of the evidence").

*Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v. Allscripts-Misys Healthcare Sols., Inc.*, 778 F. Supp. 2d 858, 872 (N.D. Ill. 2011) (collecting cases).

In determining whether reliance is reasonable or justified, "we must consider all of the facts that [plaintiff] knew, as well as those facts [plaintiff] could have learned through the exercise of ordinary prudence." *Cozzi Iron & Metal, Inc. v. U.S. Office Equip., Inc.*, 250 F.3d 570, 574 (7th Cir. 2001) (citing *Adler*, 271 Ill. App. 3d 117, 648 N.E.2d at 232); *Tirapelli v. Advanced Equities, Inc.*, 351 Ill. App. 3d 450, 456, 813 N.E.2d 1138 (1st Dist. 2004) (same). "[T]he trier-of-fact is best able to sort out the conflicting evidence and inferences to determine if a plaintiff did, in fact, rely on the defendant's misstatements." *Rowe v. Maremont Corp.*, 850 F.2d 1226, 1234 (7th Cir. 1988). In addition, materiality and reliance may overlap. For example, whether a particular investor relied on a statement is not dispositive of the question of whether a reasonable investor would find the statements material, but actual reliance is still relevant to that question. *See United States SEC v. Kameli*, No. 17 C 4686, 2017 U.S. Dist. LEXIS 142842, at *21–22 (N.D. Ill. Sep. 5, 2017) (internal citations and quotations omitted).

Having considered all the testimony and the exhibits admitted into evidence, the Court finds Meyer failed to prove that Defendants violated the Illinois Securities Law. The following alleged misrepresentations or omissions were at issue at trial: (1) Calhoun's track record; (2); the Calhoun Fund's past performance; (3) Calhoun's growth of assets under management; (4) Ward's personal bankruptcy;

and (5) Ward's registration as an investment adviser. In its assessment, the Court considers the "total mix of information" available to Meyer at the time he invested in the Calhoun Fund: (1) the understanding that broker-dealer Qa3 had completed due diligence for Orizon; (2) the recommendation from registered investment adviser and Meyer's employer, Orizon, regarding where to invest his newly-available funds; (3) Meyer's phone calls with Ward; and (4) investment documents which were the Subscription Agreement that Meyer signed, the DDQ, the Taipan Marketing Overview, the Calhoun Fund Marketing Document, and the Calhoun Fund Offering Memorandum.

### 1. Calhoun's Track Record

Meyer testified that it was important to him that Calhoun's track record demonstrated that it was successful organization. (Tr. at 17). In the Taipan Marketing Overview (PX 6), under "Why Use Taipan Wealth Advisors?"[17] it states, "Excellent Track Record: We've had positive returns for every client every year since starting our business in 1998, including 2000-2002, when the stock market experienced double digit losses."[18] When asked about this document, what was "most telling" to Meyer was that said "excellent track record" and "referenced the track record and highlighted that it made money when the stock market was down in 2000, 2002." (Tr. at 22–23).

---

[17] As discussed, *supra*, Meyer understood that Taipan was a predecessor to Calhoun.

[18] This statement is also found in the DDQ. (PX 4 at 7).

The first problem with Meyer's argument is that there was no evidence at trial that the statements about Calhoun's "excellent track record" and "positive returns" were false. The SEC found that Ward's marketing materials referred to a 10-year track record, but Ward "did not maintain documentation supporting this track record" and "her recordkeeping was scattered and disorganized." (PX 11, ¶14). But the SEC did *not* conclude that the track record was false. And Plaintiff did not show that Calhoun's statements about its track record were false.

In addition, the Court finds that that statements "excellent track record" and "positive returns for every client every year since. . . 1998, including. . .when the stock market experienced double digit losses" are not material because they are puffery. "Vague statements about. . . unquantified growth are classic puffery." *Anderson v. Abbott Labs.*, 140 F. Supp. 2d 894, 905 (N.D. Ill. 2001), *aff'd*, 269 F.3d 806 (7th Cir. 2001). Meyer's own testimony shows that he understood the Taipan Marketing Overview to be an overview of the company. (Tr. at 22).[19]

These general statements, which also do not mention the Calhoun Fund specifically, are similar to statements courts have found to be immaterial. *See Makor Issues & Rights, Ltd. v. Tellabs, Inc.,* 437 F.3d 588, 597 (7th Cir. 2006) (doubting that an investor "would rely on statements like 'we feel very, very good about the robust growth we're experiencing,' . . . [because] [t]hese vague comments

---

[19] Meyer described Ward's statements in their telephone conversations as similarly unspecific: she "gave me the impression that the story she was telling kind of affirmed the documentation that she had sent" and she "talked to, you know, the strength of their team and so forth." (Tr. at 23–24).

did not identify the [product] in particular and were unlikely to induce an investor to purchase Tellabs's stock."); *Allscripts-Misys Healthcare Sols., Inc.*, 778 F. Supp. 2d at 872 (collecting cases in which statements such as "[Defendant's] revenue and earnings growth outlook remains positive given our strong underlying fundamentals and our proven growth strategy[]" were not material); *SEPTA v. Orrstown Fin. Servs., Inc.*, No. 1:12-cv-00993, 2015 U.S. Dist. LEXIS 80584, at *89 (M.D. Pa. June 22, 2015) (statement "proven track record" was immaterial "corporate puffery on which no reasonable investor would rely.").

### 2. The Calhoun Fund's Past Performance

The Calhoun Fund Marketing Document (PX 9) bears the label "Calhoun Market Neutral Fund" and contains tables including a comparison of "Calhoun" to the S&P 500 during down markets and one representing "monthly performance" dating back to 1999. Meyer said he believed this document represented the performance of the Calhoun Fund dating back to 1999, and it was important to him that the Calhoun Fund had existed for eight years. (Tr. at 18–20).[20]

The Court does not credit Meyer's testimony about the significance of this information and does not believe, in light of the information Meyer knew or could have learned, that his reliance was reasonable. He testified, contradictorily, both that the fund "was just getting started" and that it "was established back in 1999." (Tr. at 18). Later, Meyer admitted that he believed that "the investments that this

---

[20] When asked if he had conversations with Ward about the track record of the Calhoun Fund, he answered, "I inquired about it into the extent of just commenting on it. And she affirmed that---she gave me the impression that was their track record…" (Tr. at 24).

fund was investing in were identical to the funds that were already in existence, but they were going to be tracked separately…so our understanding [was] – as investors as well as advisors is they were all one and the same." (*Id*. at 52). Ward's testimony was consistent with this description: the performance statements in the Calhoun Fund Marketing Document were for the largest fund her company managed for Fidelity Insurance, which started in 1999, and the same portfolio was used to create the Calhoun Fund (and the domestic fund). (*Id*. at 105, 112, 133). Plaintiff did not offer any evidence at trial that the representation of the Fidelity fund's performance was false.

Additionally, there was cautionary language and disclaimers in the Calhoun Fund Marketing Document and other documents that made reliance on the alleged misrepresentations about the Calhoun Fund unreasonable. In *JJR, LLC* 2016 IL App (1st) 143051, after a bench trial, the court found that plaintiffs did not rely on allegedly false statements because those statements "were mitigated by the cautionary language and disclaimers attached to the executive summary, the e-mails, the PowerPoint, the PPM, and the nonreliance clause in the subscription agreement." *Id*. at ¶ 52. Indications in an executive summary and powerpoint gave plaintiffs "sufficient notice" that the technology was not available when they invested. *Id*. In affirming the trial court's judgment, the appellate court noted that the trial court found plaintiffs to be sophisticated investors and also not credible. *Id*. at ¶54.

Similarly, here, the Calhoun Fund Marketing Document stated that returns and statistics prior to 2006 were unaudited and *from one significant managed account before Calhoun was formed. (*PX 9) (emphasis added). It also stated that past performance may not be indicative of future results and the summary is not to be construed as a solicitation. When asked if, at the time he invested, he recalled reading the "fine print" on this document about returns being from an account before Calhoun was formed, Meyer responded that he did but he was "more focused on [other representations such as that Calhoun was "an established organization"] rather than the specifics of what was inferred [sic] below [in the 'fine print']." (Tr. at 21–22). The Court does not believe that a sophisticated investor like Meyer would rely on this document but at the same time ignore text that is only slightly smaller than other text on this *one page document*.

Other documents Meyer reviewed also contained cautionary language and disclaimers. The DDQ stated that it was for informational purposes only, not intended to constitute investment recommendations, and did not constitute "an offer to sell or a solicitation of an offer to purchase any investment product, which can only be made by the Confidential Offering Memorandum of the Fund…". (PX 4). In the Subscription Agreement Meyer signed, he represented that "the performance of the Fund, may be based on unaudited and in some cases, estimated valuations of the Fund's investments…"; agreed that he had the financial background to "evaluat[e] the merits and risks of an investment"; and had the "ability to suffer a complete loss of the investment." (DX 4H).

### 3. Growth of Assets Under Management

Meyer asserted in his proposed findings that "Defendants exaggerated the growth of assets under their management for the ten years leading up to the investments at issue." (Dkt. 127 at 4).[21] In the DDQ, one question asked about the current assets under management; Calhoun answered that it had "approximately $237 million under advisement" in 2006 (the DDQ was updated in 2006). (PX 4 at 4–5, 15).[22] The next question asked about Calhoun's growth of assets under management; Calhoun responded with a series of numbers beginning with $0 in 1998 and growing to $200 million in 2004. (*Id.* at 5). In the SEC OIP, the SEC stated that at the time Ward completed the DDQ, Ward "had never had more than $3 million under management." (PX 11 at 3). Meyer testified that had he known this, he would not have invested and the growth of assets under management was a "compelling issue." (Tr. at 25, 50).

Meyer's testimony on this issue was contradictory and confusing. He testified that he was not misled by the responses in the DDQ so much as confused by them: the references to "assets under management" and "assets under advisement" were "confusing." (Tr. at 16). Meyer stated that he did not know "which one was the right

---

[21] At trial, Meyer testified that he did not recall Ward ever telling him the amount of her assets under management; instead he was "just going solely [based on] the DDQ." (Tr. at 25).

[22] Although Meyer also stated he was seeking to recover for Defendants' misrepresentations regarding "assets under advisement" (Dkt. 125 at 2; Dkt. 127 at 4), there was no evidence at trial that the representation in the DDQ that Calhoun had $237 million under advisement was false.

one" and thought the terms were being used "interchangeably", but nevertheless "assumed it must have been assets under management." (*Id*. at 16, 55–58). He also testified that "the more important issue" was that "the track record demonstrates this must have been – must be a successful organization. They have obviously developed a track record of growing the firm, . . . And so whether or not it said advisement or whether it said assets under management, the bigger issue to me was it was demonstrating that they had a track record and they. . . inferred [sic] that they were successful. So that was very important to me."[23] (*Id*. at 17). In addition, and of significance to the Court in terms of Meyer's credibility, he did not explain why, despite knowing the terms "under advisement" and "under management" had two meanings, he did not ask Ward about this or the references in the DDQ before investing. (*Id*. at 25, 58).

In determining materiality and reliance, courts assess the context in which a statement is made and the facts plaintiff knew or could have learned through ordinary prudence. *See Allscripts-Misys Healthcare Sols., Inc.*, 778 F. Supp. 2d at 872–73; *Tirapelli*, 351 Ill. App. 3d at 456. Here, in the DDQ, the answer to the question immediately preceding the question about growth of assets under management stated the amount of assets *under advisement*. (PX 4 at 5). The DDQ also contained other statements about Calhoun's assets under advisement: the most important milestone was "surpassing the $100 million under advisement mark" and

---

[23] Meyer further testified that he "was more focused on the track record rather than whether it was under advisement or whether it was under management"; he "wasn't getting hung up on whether it was under advisement or under management." (*Id*. at 54–55).

for the current size of Calhoun's products, "assets under advisement are approximately $237 million." (PX 4 at 4, 5). Another question asked "what percentage of assets under management is in funds of funds?"; the response was "n/a." (*Id*. at 4).

The Court finds that a reasonable, sophisticated investor in Meyer's position would not have considered a single response in the DDQ, which was inconsistent with other responses in the DDQ, important enough to significantly alter the total mix of information available. It was not reasonable to rely on this one response in the DDQ considering all that Meyer knew and what he could have learned or clarified by simply asking Ward. And Meyer's testimony showed that he did *not* actually rely on the representation of assets *under management*. He was more focused on growth of assets *generally*. (see Tr. at 58, 69). But there was no evidence that representations of Calhoun's assets under advisement or growth of assets generally were false.

### *4. Ward's Personal Bankruptcy*

When asked if he would have invested had he known that Ward filed for personal bankruptcy in 2002, Meyer responded, "No way. Not a personal reflection on her, just an element of concern." (Tr. at 14). There was no evidence, however, that Ward had a duty to disclose her bankruptcy to Meyer. *See Platinum Partners Value Arbitrage Fund, Ltd. P'ship v. Chi. Bd. Options Exch.*, 2012 IL App (1st) 112903, ¶ 24, 364 Ill. Dec. 137, 145, 976 N.E.2d 415, 423 (omission required breach

of actionable duty by defendant to disclose information to plaintiff) (quoting *Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1331–32 (7th Cir. 1995) ("Mere silence about even material information is not fraudulent absent a duty to speak.")); *ABN AMRO, Inc.*, 595 F. Supp. 2d at 834 (plaintiff must allege duty to disclose omitted information).

Meyer testified that an individual bankruptcy is "a big deal in the industry" and a required disclosure on the "U4".[24] (Tr. at 14). But Meyer did not inquire about any previous bankruptcies by Ward as he relied on Orizon or Qa3 to perform that due diligence. (*Id*. at 71). Furthermore, in terms of the documents Meyer did review, he admitted that he did not know if an individual bankruptcy must be disclosed in a DDQ. (*Id*. at 15). In fact the DDQ that Ward completed did not ask for this information. (PX 4). Plaintiff does not cite to any case law in which the failure to disclose a personal bankruptcy was a material omission giving rise to a securities violation. Indeed the information required to be disclosed in securities cases is usually *non-public* information (*see Wright v. Int'l Bus. Machs. Corp.*, 796 F. Supp. 1120, 1125 (N.D. Ill. 1992), and bankruptcy filings are public records. *Bargo v. Porter Cty. Ind.*, No. 2:16-CV-177-JVB-JEM, 2017 U.S. Dist. LEXIS 112769, at *7 (N.D. Ind. July 19, 2017).

---

[24] Form U4 is FINRA's "Uniform Application for Securities Industry Registration or Transfer".

### 5. *Ward's Registration as an Investment Adviser*

Meyer testified that he assumed Ward was personally registered as an investment adviser and it would have been "of concern" and he "probably would not have invested" had he been aware that Ward was not registered. (Tr. at 8, 11).

Meyer's testimony is not convincing to prove this alleged omission was material or that he relied on it. (There was no evidence that Ward represented to Meyer that she was a registered investment adviser; Meyer testified that he "assum[ed]" this (*Id.* at 8)). As with Ward's personal bankruptcy, there was no evidence that Ward had a duty to disclose her status (or lack thereof) as a registered investment adviser. The undisputed evidence also showed that the companies Taipan and Calhoun were registered investment advisers. Meyer's testimony also contradicted his claim of reliance: he said he believed he was investing in a "team" (Tr. at 52), and with regard to Ward, he assumed "everything was clean" because "she has gone through those clearances…I would assume that that is something that Qa3 and/or Orizon would have done…I did not check all that." (*Id.* at 71).

Meyer argued in his proposed findings that Defendants "exaggerated their professional experience in investment advising." (Dkt. 127 at 4). The Court has already discussed Ward's alleged lack of investment advisor registration and Defendants' track record and growth of assets. There was no other evidence at trial that Meyer relied on any other alleged misrepresentations of Defendants' "professional experience in investment advising."

## C. Rescission and Unjust Enrichment

Because the Court finds that Plaintiff did not prove a violation of the federal or Illinois securities laws, there is no basis for rescission. Moreover, Meyer's theory that he is entitled to rescission because Defendants were not properly registered under federal law as investment advisers is flawed. (Dkt. 127 at 2; Dkt. 136 at 2) (citing 15 USCS § 80b-3(a)). The focus at trial was on whether Ward had personally registered. In any case, Meyer does not have a claim under the Investment Advisers Act of 1940 (15 USCS §§ 80b-1 *et seq*.)) against either Defendant.

The U.S. Supreme Court has stated that a limited private remedy exists under the Investment Advisers Act "to void an investment advisers contract, but [] the Act confers no other private causes of action, legal or equitable." *Transamerica Mort. Advisors, Inc. v. Lewis*, 444 U.S. 11, 24, 100 S. Ct. 242, 249 (1979). Section 215 of the Investment Advisers Act provides for "specific and limited relief in a federal court." *Id*. at 18. Following *Transamerica,* courts limit relief under Section 215 to clients of investment advisers. *Zurich Capital Mkts., Inc. v. Coglianese*, 332 F. Supp. 2d 1087, 1114 (N.D. Ill. 2004); *see also Clark v. Nevis Capital Mgmt., LLC*, 2005 U.S. Dist. LEXIS 3158, at *42 (S.D.N.Y. Mar. 2, 2005) ("only parties to an investment advisory contract may sue under section 215."). In *Zurich Capital*, the court held that plaintiff could not seek rescission where he was an investor, not a party to the contract. Plaintiff's broad reading of the Investment Advisers Act was rejected because of "the restricted reading of claims under the Act by the Supreme Court." 332 F. Supp. 2d at 1114. In this case, Meyer did not offer any evidence at

trial, and has not argued, that he was in a client-adviser relationship with Defendants. Instead, he identified himself as an "investor." (Tr. at 34). The parties also stipulated that Calhoun was the investment adviser to the Calhoun Fund (Stip. at ¶ 2), suggesting that the Calhoun Fund was the client.

As Meyer acknowledged (Dkt. 127 at 6), if an unjust enrichment claim "rests on the same improper conduct alleged in another claim, then the unjust enrichment claim will be tied to this related claim—and, of course, unjust enrichment will stand or fall with the related claim." *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 517 (7th Cir. 2011); *Ass'n Ben. Servs. v. Caremark Rx, Inc.*, 493 F.3d 841, 855 (7th Cir. 2007). That is the case here. Meyer did not present any evidence of improper conduct that was not the same as the improper conduct alleged in the securities claims, which the Court has resolved in favor of Defendants. Meyer himself argued that the "essence of [his] claims focuses on the Defendants' exaggerated growth of assets under their management for the ten years leading up to the investments at issue, further exaggerations of professional experience in investment advising and the failure to disclose the personal bankruptcy of Ms. Ward…" (Dkt. 127 at 6). Of his $209,000 investment, $144,324.43 was returned to him. Even if there were a basis for an unjust enrichment claim, which there is not, the Court would not find that Defendants' "retention" of the remaining amount "violates the fundamental principles of justice" when Meyer agreed when he invested that he had the financial background to evaluate the risk and the ability suffer a complete loss of his investment.

## VI. CONCLUSION

For the foregoing reasons, Defendants are entitled to judgment on all remaining claims in Plaintiff's Amended Complaint. IT IS HEREBY ORDERED AND ADJUDGED that FINAL JUDGMENT is entered in favor Defendants Calhoun Asset Management LLC and Krista Ward and against Plaintiff David Meyer. Within thirty (30) days of this order, Defendants may file a motion seeking reasonable costs pursuant to Federal Rule of Civil Procedure 54(d)(1).

Dated: December 18, 2017               E N T E R:

                                    _____
                                    MARY M. ROWLAND
                                    United States Magistrate Judge